Clarence DeROSE, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17996.

United States Court of Appeals
Ninth Circuit.

March 15, 1963.

Rehearing Denied April 16, 1963.

Richard Alan Wasserstrom, Stanford, Cal., for appellant.

Cecil F. Poole, U. S. Atty., and Jerrold Ladar, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before HAMLIN and DUNIWAY, Circuit Judges and MADDEN, Judge of the Court of Claims.

DUNIWAY, Circuit Judge.

Convicted of selling a narcotic drug unlawfully imported into the United States (21 U.S.C. § 174) and of forcibly resisting federal officers who were engaged in performance of their duties (18 U.S.C. §§ 111 and 1114), DeRose appeals. He attacks only the narcotics conviction, for which he was sentenced to five years. (Sentence on the other count was one year, concurrent).

At the trial, DeRose testified that on February 9, 1962 he took a "special employee" of the government, one Douglas, to a place in San Francisco where the drug was "stashed," showed him the narcotic (Methadon) and received $500. He claimed, however, that the drug belonged to someone else, one Sonny Watkins. In addition to DeRose's own testimony, there is ample testimony, by Douglas himself and by federal agents, that the sale took place. Thus, DeRose's guilt is undisputed, except as to one element of the offense, illegal importation or knowledge of illegal importation.

On this appeal, he makes two contentions: 1. That certain admissions made by him to state and federal officers, that he imported the drug from Mexico, were improperly received in evidence because they were made after he had been told that if he cooperated he could plead guilty to a charge of violating the Harrison Act, in which case he would be eligible for probation or parole, as he is not under the present judgment. (See 26 U.S.C. § 7237(d).) 2. That the presumption established by the second paragraph of 21 U.S.C. § 174,[1] as applied to the possession of the drug Methadon here involved, is unconstitutional under the fifth amendment (due process) to the Constitution. He is represented by counsel assigned by this Court.

The jury had before it at least five items of evidence showing importation and knowledge:

1. A statement DeRose made to Douglas, on the way to the cite of the sale. DeRose was arrested immediately after the sale. Just before the sale, Douglas was equipped with a microphone and transmitter, and agent Wilkins heard DeRose "explaining to Mr. Douglas that he could get good stuff from Mexico and that the stuff could be cut several times. He explained to Mr. Douglas that the stuff he was taking him to at this time had not been touched by himself. He said he had not done anything to it." ("Stuff" meant the narcotic). There was no objection to this testimony, nor could any valid objection have been made. Standing alone, it would support a finding that DeRose imported the drug. When DeRose took the stand, he did not deny the statement. He said "The only mention was about cut, if it could be cut. He wanted to know could it be cut."

2. A statement made by DeRose on January 19. Officer Hilliard, of the Oakland police, produced by the government on rebuttal, testified that he talked with DeRose on January 19, in the presence of State Narcotics Agent McBee and a Mr. Fletcher, DeRose's then attorney. DeRose had been arrested on that day on a state narcotics charge. Over objection

1. "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

that the proposed evidence was "part of the prosecution's case in chief," and "cumulative," he was permitted to give the following testimony:

"Q. During that conversation was the name Sonny Watkins mentioned?

"A. Yes, it was.

"Q. Who mentioned it?

"A. Mr. DeRose.

"Q. What did he say about Sonny Watkins?

"A. He stated that he had met a Sonny Watkins in Mexico some months prior to the 19th of January, 1962, and that shortly before he had been arrested he had contacted this Sonny Watkins in San Francisco, and that Mr. Watkins had showed him how to package, dilute narcotics, and had, in fact, sold over $1,000 worth of narcotics for him.

"Q. The defendant had sold over $1,000 worth of narcotics to Watkins?

"A. He stated that Sonny Watkins had sold over $1,000 worth of narcotics for himself.

"Q. Did the defendant state where the narcotics came from?

"A. Yes, sir.

"Q. Where from?

"A. He said they came from his home town in Mexico, a town called Mazitlan. [sic]

"Q. Did he state who brought it into the United States?

"A. Yes.

"Q. Who?

"A. He stated that he did.

\*    \*    \*    \*    \*    \*    \*

"Q. Did I understand the defendant said he had sold narcotics to Sonny Watkins?

"A. No, he stated that he had contacted Sonny and that Sonny had helped him dilute some narcotics, and that Sonny had sold over $1,000 worth of narcotics for him."

Hilliard also testified, on cross examination, that after the January 19 arrest, "we" asked DeRose to cooperate.

"Q. And as part of the cooperation, did you ask him to write to Mexico?

"A. I suggested he write to Mexico, yes, sir.

"Q. Now, Officer Hilliard, what did you tell Mr. DeRose you would do for him if he did cooperate?

\*    \*    \*    \*    \*    \*    \*

"A. Yes, I told Mr. DeRose that if he would assist us in arresting the person who was supplying him with narcotics, that if he were found guilty of the possessing charge, that he was charged with in Oakland, I would see that the Court was made aware of his cooperation, and I would also notify the Probation Office of the help that he had given us.

"Q. Did you say also that you would talk to the judge in person?

"A. Yes, I did."

No motion to strike the Hilliard testimony was made by DeRose's counsel.

From this testimony, the jury could conclude that DeRose was in the business of bringing narcotics from Mexico, and disposing of them through Watkins. It could infer that the drug sold to Douglas some twenty-one days later, on February 9, was part of what DeRose had imported.

■ It is noteworthy, we think, that counsel made no attempt to show that DeRose's statement to Hilliard and McBee, made in the presence of DeRose's own lawyer, was subsequent in time to the suggestion of cooperation and offer of assistance, much less that it was induced by the suggestion or offer. The only reasonable conclusion is that it was not. The one objection that was made was addressed to the court's discretion, and there was no error in overruling it. (Lelles v. United States, 9 Cir., 1957, 241 F.2d 21, 25, and cases there cited.)

3. A statement made by DeRose on or about February 11. Agent Feldman testified that approximately two days after

DeRose's arrest, he talked to DeRose in the presence of Hilliard, and gave the following version of the conversation:

"Q. Was there any discussion of narcotics at that time?

"A. There was, sir.

"Q. And what did the defendant say about narcotics, if anything, at that time?

"A. The defendant stated to Sgt. Hilliard, 'I told you, Sergeant, I get my stuff from Mexico. I am willing to write a letter and bring the man up. I can't do any more.'"

There was no objection. Our comments about the January 19 statement are equally applicable to this one.

4. A statement made by DeRose on March 15. Agent Feldman testified that on March 15, he had a conversation with DeRose at the jail in the presence of Mr. Lyon, Mr. DeRose's attorney, and of agent Tyler. He testified:

"Yes, sir, Mr. DeRose asked me if we found the particular thing we were looking for. I told him no, we didn't. I told him I thought perhaps there was more which he hadn't told us about. He again stated that he told us everything he had in San Francisco and, 'As I stated to you before,' he said, 'I can go to Mexico and I can get the man who I get the stuff from and have him brought across the line.' I told him that so far as Mexico was concerned, it was out and anything he had to do he would have to do in the United States."

The only objection was as to relevancy. That objection was obviously untenable.

On cross-examination, Feldman said that he had talked to Lyon, DeRose's attorney, and recited the conversation in the following manner:

"Q. Now, was it the gist of those conversations that if the defendant would cooperate, you would seek to aid him in this matter?

"A. That is correct, sir.

"Q. And by 'aiding him,' did you indicate that you would seek to have him charged under the Harrison Act?

*  *  *  *  *  *  *

"[A.] I believe, sir, there were two things in question: one, the question of his bail, and second, I believe I spoke to you and mentioned to you that many people who have cooperated with the approval of the United States Attorney's Office have been allowed to plead to the Harrison Act.

"Q. Now, you then stated that if he would cooperate you would use your efforts or those of your department to aid him?

"A. We did, sir.

"Q. Now, as a basis of that, did the defendant have a conversation with you?

"A. He did not. I retract that statement, sir. He had a conversation after I had spoken to Mr. Lyon, after his cooperation had proved to no avail.

"Q. This conversation in the City Jail, though, was in regard to cooperation?

"A. It was, sir.

"Q. Now, the idea being that if he would cooperate, you would aid him if you could?

"A. The idea was that if he would cooperate it would be brought to the attention of the United States Attorney and the Honorable Court.

"Q. Thereafter, these conversations followed?

"A. Just one conversation that I ever had with Mr. DeRose.

"Q. That was the conversation in the San Francisco County Jail, is that correct?

"A. That is correct, sir."

Counsel then moved "to strike the evidence on the ground that there was an offer to aid the defendant and as a result

of this offer he incriminated himself." He also stated:

"Your Honor, I believe that—at least I was informed that the Department could speak to the United States Attorney and seek to have the charges reduced in this matter on the basis of cooperation. Thereafter, this conversation to which the agent has testified followed. On this basis I believe that it was an admission with an offer of reward and therefore, as such, not admissible."

The court took the motion under submission. It denied the motion at the conclusion of DeRose's own testimony, on the ground that Feldman's testimony was "not inconsistent with what this defendant has indicated as his position." This is the only evidence as to which any question was raised under the fifth amendment, relating to self-incrimination. Counsel did not ask the court to rule on the motion before putting DeRose on the stand.

5. DeRose's own testimony. As we have seen, he admitted the transaction, but claimed that the narcotic belonged to Watkins. He testified that before the Oakland arrest of January 19, he had returned to Oakland from Mexico and had been asked by a certain friend about narcotics, "and I [DeRose] told him, 'Well, Mexico is noted for such things.'" Thereafter, he obtained narcotics for his Oakland acquaintances, and that led to the January 19 arrest. On direct examination, no attempt was made to show that any of the statements that we have quoted were not made, nor that any of them were made as a result of any promise by the officers to assist him if he would cooperate. On cross-examination he stated that the drug involved in the January 19 arrest was also Methadon, but denied that he had brought it himself from Mexico. He admitted the January 19 statement, but denied that it was true. At Hilliard's request he wrote a letter to his contact in Mexico. He admitted that he never gave either the state or the federal officers any specific information, although, according to his testimony, he

had considerable. His testimony makes it clear that the "cooperation" suggested by the officers was not the making of the statements here involved; what they asked was that he act as an informer, which he did not do.

No motion to strike any of the statements was made (or, in reference to the March 15 statement, renewed) before the case went to the jury. The procedure in this circuit is for the jury to consider the voluntariness of a confession, if the judge initially determines it to be admissible (see Dyson v. United States, 9 Cir., 1960, 283 F.2d 636). Yet, no instructions as to the claimed involuntary character of the admissions, or as to the effect of any promise of benefit for cooperation, were asked. None was given, and no exceptions were taken to the court's charge.

■■ One cannot read the entire record in this case without coming to the firm conviction that the statements made by DeRose were voluntary, that his trial counsel was of the same opinion, and that is why he made no effort to build or protect a record that would preserve the point now made by assigned counsel. Constitutional rights can be, and often are, waived, and this frequently happens in the course of a trial. If trial counsel concludes that it is better not to urge what is, at best, a very doubtful point, because doing so is more likely to hurt than to help his client before the jury by emphasizing evidence that he prefers to minimize, it is not the duty of the appellate courts to create for him a record that was never made and then to reverse for points that were never urged, or, if urged, were dropped. (See Johnson v. United States, 1943, 318 U.S. 189, 199–202, 63 S.Ct. 549, 87 L.Ed. 704) This case does not involve any such "plain error" (F.R.Crim.Proc. Rule 52(b)) as requires our departure from this salutary rule.

■■ The rule of waiver is peculiarly applicable to the privilege against self-incrimination, which is the principal point raised in the trial court. The gen-

eral rule in the federal courts, often applied, is that a defendant waives the privilege, at least to the extent that he lays himself open to full cross-examination relating to the matters to which he testifies, when he elects to take the stand and testifies, as DeRose did here. (See Brown v. United States, 1958, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589; Ziegler v. United States, 9 Cir., 1949, 174 F.2d 439, 446–447). It is not necessary for us to hold, and we do not hold, that solely because of so taking the stand and testifying, DeRose waived his objection, stated in the motion to strike the March 15 statement. But he did lay himself open to cross-examination upon it, which to our minds, strengthens the conclusion that his counsel elected to abandon the contention, as to all statements made by DeRose to the officers.

We are fully aware of the rule urged here, and recently restated by the Supreme Court, as to confessions obtained by promises, in Shotwell Mfg. Co. v. United States, 1963, 371 U.S. 341, 347–348, 83 S.Ct. 448, 453, 9 L.Ed.2d 357:

> "The controlling test is that approved in Bram [Bram v. United States, 1897, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568]: ' "a confession, in order to be admissible, must be free and voluntary: that is, * * * not * * * obtained by any direct or implied promises, however slight * * *." ' Bram v. United States, * * * at 542–543, [18 S.Ct. at 187]. Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion."

But DeRose is in no position to invoke it.

■ The court fully instructed the jury as to the presumption established by 21 U.S.C. § 174. No exception was taken to the charge, as required by Rule 30, F.R.Crim.Proc. No suggestion was made to the trial court that the presumption was not valid as applied to this case. Counsel did, on cross-examination of the government chemist, bring out the fact that Methadon is a synthetic, manufactured commercially in the United States. (See Exec. Proclamation No. 2738, 12 Fed. Reg. 5269 (1947), following 26 U.S.C.A. § 4731) But no attempt was made to make a record as to the conditions or restrictions under which it is made, the quantity produced, the extent to which it is made elsewhere, or any other facts on the basis of which a decision could be made as to whether the presumption can properly be applied to Methadon.

■ The question is not ripe for decision. (See Carson v. United States, 9 Cir., 1962, 310 F.2d 558, 561–562). It was never raised below. Moreover, the presumption as to illegal importation and knowledge has been held valid as applied to drugs other than Methadon, including marijuana, which is produced here. (See discussion in Hernandez v. United States, 9 Cir., 1962, 300 F.2d 114, at 118–119, and cases there cited; Caudillo v. United States, 9 Cir., 1958, 253 F.2d 513, 517). One who asserts that a statute, particularly one that has been held valid in other cases, is invalid when applied to his case, has a duty to make a record that will properly present the point. Here, the point was not even raised.

Rule 52(a), F.R.Crim.Proc., is the rule applicable to this case, not Rule 52(b).

Affirmed.