Filed 6/5/25  Marriage of Iskarous and Stefan CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Marriage of JAMES ISKAROUS and SAUNDRA STEFAN. | |
| JAMES ISKAROUS, Appellant, v. SAUNDRA STEFAN, Respondent. | G064275 (Super. Ct. No. 20D005912) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James L. Waltz, Judge. Affirmed as modified.

Decker Law, James Decker and Aisling Gorman for Appellant.

Law Offices of Lisa R. McCall, Lisa R. McCall and Erica Barbero for Respondent.

\*                \*                \*

Appellant James Iskarous and respondent Saundra Stefan were married for seven years and had two minor children (the children) before separating.[1] A dissolution trial was later held concerning the characterization of certain property, division of community assets, child custody, and support orders. After the case was submitted, the judge who had tried the matter became indefinitely unavailable before rendering judgment. The parties then met with the family court presiding judge who presented them with two options. First, they could stipulate to have a new judge assigned to the case who would rule after reviewing the transcripts and evidence submitted during trial. Second, they could have a mistrial declared and redo the trial. The parties chose the first option. The new judge met with the parties then entered judgment.

James now appeals several aspects of the judgment. Primarily, he argues his due process rights were violated because the judge who decided the case had not heard the evidence personally. We disagree. The family court found James had waived this right, and this finding is supported by substantial evidence. We also conclude James has shown no error with regard to (1) the court's finding that the parties' marital home was community property, (2) its child custody ruling, or (3) the amount of child support it awarded Saundra. However, we agree with James that the amount of the equalization payment he was ordered to make is unsupported by the record. Thus, we will modify the amount of the equalization payment to reflect the

---

[1] As is customary in family law cases, we refer to the parties by their first names. (*In re Marriage of Lietz* (2024) 99 Cal.App.5th 664, 667, fn. 1.)

correct sum and affirm the judgment as modified. We also deny James's motion to augment the record and request for judicial notice.

FACTS AND PROCEDURAL HISTORY

A. *Petition for Dissolution*

James and Saundra married on September 1, 2013, and they had children in 2015 and 2020 before separating on September 28, 2020. A few days after their separation, Saundra petitioned to dissolve their marriage.

After the dissolution petition was filed, both parties accused the other of verbal and physical abuse. Saundra filed an ex parte request for a domestic violence restraining order (DVRO) to protect both her and the children from James. The court granted the ex parte request and issued a temporary restraining order protecting Saundra and the children.

James filed a response denying the allegations in Saundra's DVRO petition. He claimed she had fabricated them "to gain an upper hand in [their] divorce" and keep him away from the children. He then filed his own ex parte request for a DVRO against Saundra, which was also granted.

In November 2020, during the middle of the trial on Saundra's DVRO request, both Saundra and James dismissed their respective DVRO petitions by stipulation. Under their stipulation, James was granted visitation with the children during the week from Tuesday afternoon to Thursday morning and on alternating weekends from Friday afternoon to Sunday evening. The parties also agreed to split holidays and to meet and confer about adding more time to James's visitation schedule.

The parties continued to argue over visitation, and James filed a request for an order to increase his time with the children. In February 2021, the day before the hearing on this request, the parties stipulated (the February 2021 stipulation) to allow James to have visitation on alternating

3

weekends from Friday afternoon until Monday morning (rather than Sunday evening), and to have the children every week on from Tuesday afternoon to Thursday afternoon (instead of Thursday morning). The February 2021 stipulation also clarified that "[f]or purposes of custody and visitation, Orange County shall be deemed the children's residence."

During the parties' marriage, they lived together in a home in Huntington Beach (the home). They both vacated the home after their separation, and James used it as a rental property. In the February 2021 stipulation, the parties agreed that James would have exclusive use of the home. At the time of trial, James was continuing to use the home as a rental property and living with his parents in Downey. Saundra lived in Irvine, and the children attended school in Newport Beach.

B. *Trial and Assignment of New Judicial Officer*

In April 2023, a status-only judgment was entered, dissolving the parties' marriage. Trial on the remaining issues commenced in June 2023, with Judge Eric Scarbrough presiding. The parties gave their closing statements on August 11, 2023, then Judge Scarbrough took the matter under submission.

Unfortunately, Judge Scarbrough had an emergency issue and became indefinitely unavailable before he could rule on the case. Submission of the matter was vacated on November 1, 2023. That same day, the parties met with Family Law Supervising Judge Julie Palafox to discuss the case. She presented them with two options.

First, they could resume the case with a new judicial officer. Judge Palafox stated that another judge had become ill last year, and new judges had been assigned to the ill judge's submitted cases with the parties' consent. She clarified that "it's not a start over. It's not a do over. What the

4

new judicial officer did was he read the transcripts. All your evidence is in. He met with the parties, had lengthy status conferences and then allowed them to go back on the record and not add new evidence but argue. Talk to him. Tell him what orders you wanted the court to make. That ended up being successful with respect to those other cases. The judicial officer that has agreed to do that in this case is Judge [James] Waltz. . . . He's agreed to take this case, [and] meet with you . . . So that you can be taken care of immediately."

Second, the parties could have mistrial declared. Judge Palafox explained that "you start [the trial] over. You get a new judicial officer assigned. You have to get on their calendar. I want you to understand I have a lot of displaced cases right now."

Judge Palafox asked James, who was self-represented, whether he had any questions. James indicated he understood the options. He then stated that "it doesn't sound like a good option for anybody to restart the trial."

Judge Palafox stated, "Stipulat[ing] to Judge Waltz is your best option for a speedy resolution of something you've been waiting almost six months since you started to resolve. It would get resolved very, very shortly." In contrast, she explained that declaring a mistrial was "the less desirable option because it's going to take a long time to get this resolved."

James asked Saundra's counsel, "what are you leaning towards? I don't know what is an advantage or disadvantage." Counsel replied that she needed to speak with Saundra. James then stated that "it sounds like the first option . . . is the most reasonable. . . . It sounds like our only option other than a mistrial."

Judge Palafox suggested the parties take time to consider their options and reconvene on November 7, 2023. She asked James whether he was available on that date. He replied that "this is just confirming our process. To be honest, I think I'm all for -- I think I like the first option over the other option. It sounds like a no-brainer to me."

There is no transcript in the record from the November 7 hearing. The minute order states, "Discussion ensues regarding proposals previously offered to parties. [¶] Parties are in agreement to have their trial matters heard before Judge James Waltz. [¶] The Court orders this case reassigned to Judge James Waltz . . . for all purposes." A status conference in front of Judge Waltz was scheduled for the next day.

The record also contains no transcript from the November 8 status conference with Judge Waltz. The minute order (the November 8 minute order) states, "Brief discussion ensues. [¶] The Court states that this case was recently assigned at the direction of the Supervising Judge, and that it will 'read and rule.'" The November 8 minute order reflects that James "ma[de] an oral motion for Restraining Order," which the court denied. Then, "[t]he Court hear[d] from Counsel for [Saundra]." The Court made several orders, including an order for the parties to meet and confer on a visitation schedule for the upcoming holiday season. If they were unable to reach an agreement, each party was directed to submit a proposed order by November 15. The court continued the matter to November 15 to allow for submission of the proposed orders. The November 8 minute order then states, "[n]o appearance required. [¶] The Court states that it will issue its ruling and Tentative Statement of Decision."

*C. Rulings and Judgment*

In early January 2024, the court issued its rulings (the rulings) on the outstanding issues, and it directed Saundra's counsel to prepare a proposed judgment. James requested a statement of decision, which the court granted. Per the court's order, Saundra submitted a proposed statement of decision, to which James objected.

The family court simultaneously entered judgment (the judgment) and filed a statement of decision (the statement of decision) in late April 2024. The court granted the parents joint legal and physical custody. However, it ruled that Saundra's home was the children's primary residence "[f]or purposes of school district jurisdiction." The children would spend about 70 percent of their time with Saundra and 30 percent with James. Specifically, Saundra would have physical custody of the children at all times except for the periods below, when James would have physical custody:

- "On alternating weekends . . . from Friday afternoon picking up at and after school (or at 12:00 p.m. noon if no school), returning the children to school the following Monday to school or outside of Macy's at the Westminster Mall at 5:00 p.m. if no school."

- "On Wednesdays, picking up at and after school (and if no school, picking up at noon at [Saundra's] home, curbside) and returning the children the same day at 7:30 p.m. to [Saundra's] home, curbside."

- "If there is no school on Thursday (such as during a school break or summertime), [James] shall return the children to [Saundra's] home, curbside, after his Wednesday visit on Thursday at 5:00 p.m. If the coming weekend is reserved to [James], then [James] shall return the children the following Monday to school or if no school, to [Saundra's] residence, curbside, at 8:00 a.m."

7

As to support, the court found James earned wages of $7,800 per month with other taxable income of $3,250 and Saundra earned $11,298 per month. The court denied both parties spousal support, but it ordered James to pay Saundra $1,034 in monthly child support.

The court found the home was community property, despite James's contention it was his separate property. It valued the home at $766,000 and found James was entitled to a $185,000 reimbursement for separate property he had contributed to its down payment. After deducting this reimbursement and the remaining mortgage balance, the court found the community had a $370,921 interest in the home. It ordered James to pay Saundra half this amount ($185,460). The court also found James had collected $81,250 in rental income from the home since the parties' separation, and it ordered him to pay Saundra half of this income ($40,625).

Finally, the court awarded various bank accounts, retirement accounts, and personal property, including several automobiles, to each party. After dividing the parties' property, it ordered James to pay Saundra an equalization payment (the equalization payment) of $231,292.

James seeks reversal of the judgment on several grounds. First, he argues his due process rights were violated because the judge who issued the judgment had not presided over the trial. Second, he asserts the court incorrectly characterized the home as community property. Third, he claims the court miscalculated the amount of the equalization payment. Fourth, he contends the court's physical custody ruling is not supported by substantial evidence. Finally, he maintains the court abused its discretion in calculating child support. We agree the equalization payment's amount is unsupported by the record but are unpersuaded by James's other arguments.

DISCUSSION

I.

DUE PROCESS

*A. Applicable Law*

Where a matter is tried without a jury, "'[a] party litigant is entitled to a decision upon the facts of his case from the judge who hears the evidence.'" (*European Beverage, Inc. v. Superior Court* (1996) 43 Cal.App.4th 1211, 1214 (*European Beverage*).) "'He cannot be compelled to accept a decision upon the facts from another judge.'" (*Ibid.*) "[U]nless the parties stipulate otherwise. [Citation.] . . . [Citation.] It is considered a denial of due process for a new judge to render a final judgment without having heard all of the evidence." (*Ibid.*) This principal, commonly called the one-judge rule, is based upon fairness. The parties have "the right to have 'the judge who hears the evidence . . . decide the case'" or they are "depriv[ed] . . . of their right to a full and fair trial." (*Armstrong v. Picquelle* (1984) 157 Cal.App.3d 122, 128.)

Here, the court found the parties had waived the one-judge rule by stipulation. The statement of decision notes, "[t]he parties appeared before Family Law Supervising Judge Julie Palafox. They stipulated their matter would be reassigned to Judge James L. Waltz . . . , who would read the trial record and rule. The parties waived any objections pursuant to *European Beverage . . . .*"

Preliminarily, James argues the waiver allowed for in *European Beverage* is not available here because that case involved a bifurcated trial. Since the trial here only contained one phase, he appears to suggest the parties could not waive the one-judge rule as in *European Beverage*. But James has not explained why bifurcated and single-phase trials should be treated differently within the context of the one-judge rule, and we are not

9

required to make the argument for him. (*City of Riverside v. Horspool* (2014) 223 Cal.App.4th 670, 679, fn.8.)

Besides, we see no reason to distinguish between bifurcated and single-phase trials. *European Beverage* does not state or even imply that the one-judge rule can only be waived in bifurcated trials. Rather, it broadly states that "[t]he right to have the same trier of fact decide all the factual issues can be waived." (*European Beverage, supra,* 43 Cal.App.4th at p. 1215.) And courts have recognized the one-judge rule can be waived by stipulation in cases involving single-phase trials. (*Rose v. Boydston* (1981) 122 Cal.App.3d 92, 94–95, 97.) Further, James's argument conflicts with the well-recognized tenet that most constitutional rights can be waived. (*TriCoast Builders, Inc. v. Fonnegra* (2024) 15 Cal.5th 766, 777; *DeRose v. U.S.* (9th Cir. 1963) 315 F.2d 482, 486.) Thus, we see no reason why James could not waive his due process right to have this case heard by one judge.

B. *Validity of James's Waiver*

James makes several arguments that all challenge the validity of his waiver. Generally, he argues he waived the one-judge rule because he believed the parties would be allowed to discuss and argue the case in front of Judge Waltz before he ruled, which James claims did not occur. However, James has not met his burden of showing error.

"On appeal, we review waiver as a factual inquiry for the trial court, and will affirm if substantial evidence supports the trial court's determination." (*Burton v. Cruise* (2010) 190 Cal.App.4th 939, 946.) The appellant has the "obligation . . . to present a complete record for appellate review, and in the absence of a required reporter's transcript and other documents, we presume the judgment is correct." (*Stasz v. Eisenberg* (2010) 190 Cal.App.4th 1032, 1039.) ""'[A]ll intendments and presumptions are

10

indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown.""" (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140.)

To begin, nothing in the record indicates James objected to any of the procedures employed by Judge Waltz. The parties met with Judge Waltz on November 8, 2023. The November 8 minute order began by noting that "[t]he Court states that this case was recently assigned at the direction of the Supervising Judge, and that [the court] will 'read and rule.'" It concluded, "The Court states that it will issue its ruling and Tentative Statement of Decision." The court then directed Saundra's counsel "to prepare a Judgment after the Court's ruling and submit it to [James] for approval as to form and content."

In short, the court told the parties (1) it would read and rule, and (2) the ruling would issue after the November 8 status conference, indicating there would be no further hearings. Despite these advisements, nothing in the record shows James objected to the court's procedures or asked to provide more argument. As such, James has forfeited his argument that Judge Waltz did not follow the procedures to which the parties had stipulated. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772 ["The general rule is that a failure to object in the trial court waives the right to assert error on appeal"].)

Even if James had not forfeited the argument, there is substantial evidence that his waiver was valid. At the November 1, 2023 status conference with Judge Palafox, James mentioned several times that it seemed like the parties' best option was to stipulate to Judge Waltz rather than restarting the trial. His statements indicate he sought a speedy resolution to the case. Further, the November 8 minute order shows the

11

parties were given time to address the court. It states, "[James] ma[de] an oral motion for Restraining Order," which the court denied, and "[t]he Court hear[d] from Counsel for [Saundra]." From this evidence, we can reasonably infer the court gave the parties an opportunity to discuss the case, and James had nothing more to add to his argument. (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1140; *Stasz v. Eisenberg*, *supra*, 190 Cal.App.4th at p. 1039.)

James highlights a portion of the November 8 minute order stating that "brief discussion ensues." He argues this entry shows he was only allowed a "brief discussion" with Judge Waltz and was not given a meaningful opportunity to be heard. But, at best, this statement is ambiguous. It was unclear what the parties specifically discussed during this discussion. For example, the parties could have declined an invitation from the court to present additional argument. We must interpret any ambiguities to support the court's finding that James's waiver was valid. (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1140; *Stasz v. Eisenberg*, *supra*, 190 Cal.App.4th at p. 1039.) Further, as set forth above, we can reasonably infer from the record that the parties were given an opportunity to address the court.[2]

---

[2] We also note that it was James's obligation to provide a complete record for us to review. (*Stasz v. Eisenberg*, *supra*, 190 Cal.App.4th at p. 1039.) The California Rules of Court, rule 8.120(b) provides that "[i]f an appellant intends to raise any issue that requires consideration of the oral proceedings in the superior court, the record on appeal *must include* a record of these oral proceedings . . . ." If no transcript is available, an appellant may provide "[a]n agreed statement under rule 8.134" or "[a] settled statement under rule 8.137." (Cal. Rules of Court, rule 8.120(b)(2)–(3).) James did not provide any of these documents for the November 8, 2023 status conference.

12

## II.

### THE HOME'S CHARACTERIZATION

Courts recognize several factors in determining whether property is separate or community owned. The most basic characterization factor is whether the property was acquired before or during the parties' marriage. (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472.) Generally, "property acquired during the marriage and before separation is presumptively community property [citation], and property acquired before the marriage . . . [is] presumptively separate property." (*Ibid*.) James asserts he acquired the home before marriage, so the court erred by characterizing it as community property. We find no error.

We review the court's characterization of the home under the substantial evidence standard. (*In re Marriage of Brandes*, *supra*, 239 Cal.App.4th at p. 1472.) Under this standard, "'[o]ur review is limited to a determination whether there is any substantial evidence, contradicted or uncontradicted, that supports the finding. [Citation.] In so reviewing, all conflicts must be resolved in favor of [the prevailing party] and all legitimate and reasonable inferences must be indulged to uphold the finding.'" (*Ibid*.)

The undisputed evidence shows Saundra and James started looking for a home together after they got engaged in 2012. The statement of decision explains that "[p]rior to the parties' marriage, James made an offer to purchase [the home] with a scheduled escrow closing date of August 21, 2013. On August 28, 2013, the sellers of [the home] executed a grant deed in favor of James, as 'a single man.' [Citation.] The parties married on September 1, 2013, the grant deed was recorded on September 17, 2013 (which referenced a September 12, 2013 promissory note), and escrow closed

13

on September 18, 2013." There is no dispute James spent $185,000 of his separate property on the home's down payment.

The statement of decision continues, "[t]he record of trial does not disclose details as to when James received the grant deed; however, under the totality of the circumstances, the Court drew the strong inference [citation] that the deed, when signed by the sellers, was executed with conditions, such as the transfer of funds due the sellers at close of escrow, which is the normal practice, and was not delivered to James until after close of escrow. No evidence to the contrary was presented. [¶] Given the Court's finding the [home] was acquired during marriage, [it] is presumptively community property . . . . The [home] served as the family residence from the parties' date of marriage until their date of separation, and during marriage, they paid the mortgage, property taxes and insurance on [the home] from their joint account which held their community property earnings. Saundra believed the [home] was their home, though she did not dispute James has a separate property interest in [the home] . . . . James did not come close to rebutting the community property presumption . . . ."

James argues he acquired home before the marriage because the down payment was paid with his separate property and the sellers executed a grant deed conveying it to him "as a single man" before the parties' marriage. He cites *In re Marriage of Joaquin* (1987) 193 Cal.App.3d 1529 (*Joaquin*), in support of his argument. In *Joaquin*, the husband executed a real property lease before the couple's marriage. The lease contained an option to renew for five years, which the husband exercised during the marriage. (*Id*. at p. 1532.) The court found the property solely belonged to the husband. It explained that "[t]he word 'acquired' contemplates the inception of title." (*Id*. at p. 1533.) The husband's exercise of the option did not create a new leasehold.

14

Rather, his "title to the property . . . was acquired at the time the option was originally given," i.e., when the initial lease was executed. (*Ibid.*) The exercise of the option "merely *extended*, or perpetuated" the initial lease's term "for an additional five years." (*Id.* at p. 1534.) Thus, even though the husband exercised the option during marriage, he "'acquired'" his property interest before the marriage. (*Ibid.*)

The situation we face is different. In *Joaquin*, the husband gained title to the property prior to his marriage when he signed the initial lease, and this interest was merely extended by the option's exercise. Here, in contrast, the court found James did not gain title to the home prior to the parties' marriage, and there is substantial evidence supporting this finding.

"'A deed does not transfer title to the grantee until it has been legally *delivered*.' [Citations.] 'Delivery is a question of intent.' [Citation.] 'A valid delivery of a deed depends upon whether the grantor intended that it should be presently operative, and a manual transfer is not conclusive evidence of such intention.'" (*Luna v. Brownell* (2010) 185 Cal.App.4th 668, 673, italics added.) Within the context of a real estate purchase, "one who contracts to buy real property does not at that time 'acquire' the property. Title to realty passes only upon full performance of the terms of the escrow agreement." (*Miller v. Miller* (1982) 133 Cal.App.3d 988, 990–991.)

Here, while the grant deed was *executed* prior to the parties' marriage, the court found it was not *delivered* to James until after the close of escrow, which occurred a few weeks after the parties' marriage. James does not contest this finding, nor does he cite any evidence showing the deed had been legally delivered prior to the parties' marriage. And even if he had, the court's finding is supported by the evidence showing the promissory note was dated after the marriage, the grant deed was recorded after the marriage,

and escrow closed after the marriage. Based on this evidence, the court could find the home's title was acquired during the parties' marriage. (*Miller v. Miller*, *supra*, 133 Cal.App.3d at pp. 990–991.) As such, the home was presumptively community property. James did not rebut this presumption below and does not claim otherwise on appeal.

James also argues the parties intended the home to be his separate property. But there is enough evidence in the record to support the court's finding that it was intended to be community property. Saundra testified that while the parties were searching for a home, James never said he was going to take title to the home in his name alone. Saundra did not believe he would take title solely in his name, nor did she understand the legal effect of him doing so. Rather, she believed the two of them were choosing their home together. Further, the parties resided in the home from the date of their marriage until separation and paid the mortgage, property taxes, and insurance on the home with community property.

Finally, James does not explain how his separate property contribution for the down payment shows the home is his separate property. Presumably, he cites this contribution as evidence that the parties intended for the home to be solely his. But, as discussed, there is substantial evidence in the record showing the parties intended the home to be community property.[3]

---

[3] The family court also found that the grant deed conveying the home to James as "a single man" did not transmute the home from community to separate property. And even if a transmutation had occurred, the court found it was the product of undue influence. James does not challenge these findings.

16

## THE EQUALIZATION PAYMENT

James makes several challenges to the amount of the equalization payment. First, he argues the court erroneously excluded evidence showing community expenses he had paid. Second, he maintains the court failed to award him any funds from a hidden bank account Saundra had maintained during the marriage. Finally, irrespective of his first two arguments, he claims the amount of the payment does not match the sums awarded to the parties. While his first two arguments lack merit, we agree the amount of the equalization payment is unsupported by the record.

*A. Excluded Evidence*

During trial, James sought to introduce a self-made spreadsheet summarizing community debts he had paid without reimbursement (exhibit W). He contends the court erred by refusing to admit exhibit W.

We review this alleged error for an abuse of discretion. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446–447.) Under this standard, reversal requires "'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Ibid*.) "An abuse of discretion is only demonstrated when no reasonable judge could have made the challenged order." (*In re Marriage of Barth* (2012) 210 Cal.App.4th 363, 374.)

To begin, James mischaracterizes the record. The court did not exclude exhibit W. Rather, it reserved ruling on its admission so the parties could meet and confer on the amount of the community debt. Specifically, when James sought to introduce exhibit W, the court noted that it only appeared to summarize amounts for which there was original documentation and that "the vast majority of [exhibit W was] entirely illegible." The court

17

asked, "can I have the parties meet and confer and come up with the amounts rather than trying to somehow read [exhibit W] here?" The parties agreed the documents underlying the debt were not disputed. So, the court inquired, "is there any reason why [the] parties can't look at the documents and [agree to the] amount [of debt]?" James replied, "I think we should be able to," and Saundra's counsel also agreed to try. The court then announced, "so we may be reserving on that limited issue until we come back." The parties then began discussing other exhibits.

Given the record, we find no abuse of discretion. The parties agreed to meet and confer about the relevant debt rather than rely on exhibit W, and the court reserved the issue for future consideration if they were unable to agree. James has not cited any portion of the record where he sought to introduce exhibit W again and was denied by the court.

Besides, even if the court's actions could be deemed a constructive denial of James's attempt to admit exhibit W, we would still find no abuse of discretion. The court found exhibit W was illegible and could not be read. We have also viewed exhibit W in its actual size and cannot read it.[4] It is not unreasonable for a court to exclude illegible evidence (see Evid. Code § 352), and James has not cited any authority showing such a ruling would have been legal error.

B. *The Undisclosed Account*

James asserts Saundra maintained a hidden bank account (the account) during their marriage that he did not discover until after their

---

[4] The record contains a PDF copy of exhibit W. It is possible for us to read exhibit W by magnifying the PDF file. But the document is unreadable when viewed at its actual size. The record indicates the court received a paper copy of exhibit W that was printed at actual size.

separation. In the judgment, the court awarded the account to Saundra "at zero value." James asserts the court made two errors as to this ruling.

First, James argues Saundra deposited $13,150 of her income into the account during their marriage. He claims the family court failed to address his request for reimbursement of half this amount. He asks us to remand this issue so the court can address it in the first instance. However, a "'party must state any objection to the statement [of decision] in order to avoid an implied finding on appeal in favor of the prevailing party. . . . [I]f a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient . . . and hence the appellate court will imply findings to support the judgment.'" (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.) James has not shown he objected to this alleged deficiency. And while we are not obligated to review the record on his behalf, we have done so and have found no such objection. Consequently, we presume the family court denied his request for reimbursement of half the $13,150.[5]

Second, James cites a bank statement (the statement) in the record showing the account had a balance of $564 as of August 17, 2020. James argues the statement shows the account's balance at the date of separation, so the court should have awarded the account to Saundra with a value of $228 (i.e., half the statement's balance) instead of $0.

The parties separated on September 28, 2020, six weeks after the statement's date. We have not been cited any evidence showing the account's balance stayed the same from August 17 to September 28. Thus, the court

---

[5] James does not argue the merits of his request, so we will not address them.

19

could reasonably find that "[n]o evidence was presented as to any date of separation balance by either party," and award the account to Saundra at $0 in value.

James also cites a portion of Saundra's closing argument, in which she offered to "stipulate to divide [the] account [balance] at $564." Based on this statement, James contends the court abused its discretion by valuing the account at $0. But James cites nothing in the record showing he ever agreed to the stipulation. Thus, it is unclear why the court would be bound by this purported offer. Besides, even if the parties had agreed to stipulate to this amount, James cites no case law showing the court abused its discretion by failing to accept their stipulation. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [appellant waives argument by failing to cite legal authority].)

C.  *Amount of the Equalization Payment*

Finally, James argues the family court miscalculated the $231,292 equalization payment. We agree this sum is not supported by the record. (See *SFPP v. Burlington Northern & Santa Fe Ry. Co.*, *supra*, 121 Cal.App.4th at p. 461 [finding of facts are reviewed under the substantial evidence standard].)

James believes the correct amount of the equalization payment is $222,396.10, which he calculates as follows:

| Property | Value |
|---|---|
| Shelter Cove | $185,460 |
| ½ of Rental Income | $40,625 |
| Daycare | $14,941 |
| Checking Account | $4045.50 |
| Toyota FJ Cruiser | $5861 |
| Mercedes c250 | $4,030 |
| BMW z4 | $7,332 |
| **Subtotal of Equalization Payment** | **$262,2294.50** |
| GLE Payment Credit | ($25,803.40) |
| GLE | ($14,095) |
| **Total Equalization Payment** | **$222,396.10** |

The portion of the chart above "Subtotal of Equalization Payment" shows sums James owed to Saundra:

- "Shelter Cove" is the home, which was awarded to James.
- "Rental Income" refers to Saundra's share of the rent that James collected from the home after separation.
- "Daycare" refers to reimbursement costs James was ordered to pay Saundra for the children's daycare.
- "Checking Account" refers to a bank account awarded to James.
- The "Toyota FJ Cruiser," "Mercedes C250," and "BMW Z4" are automobiles awarded to James.

The portion of the chart below "Subtotal of Equalization Payment" shows sums Saundra owed to James:

- "GLE" is a Mercedes GLE automobile that was awarded to Saundra.
- "GLE Payment Credit" refers to a credit awarded to James for paying off the full balance of the Mercedes GLE after separation.

In response, Saundra claims James's chart contains three errors, and the court's calculation is correct when these errors are fixed. First, she

contends half the community's share of the home (Shelter Cove), is $185,500 not $185,460. She calculates this amount by taking the $766,000 (the home's value) minus $210,000 (the remaining mortgage balance) minus $185,000 (James's separate property contribution). This leads to a community interest of $371,000, half of which is $185,500. Second, she asserts James is only entitled to half the amount of the GLE Payment Credit, i.e., $14,251.70, "because each party was responsible for one-half the payment to maintain the community asset." Third, Saundra argues James erroneously included $4,045 for the checking account because he was awarded the full value of this account and does not owe her anything for it. She provides her own chart correcting these errors:

| Property | Value |
|---|---|
| Shelter Cove | $185,500 |
| ½ of Rental Income | $40,625 |
| Daycare | $14,941 |
| Checking Account | $0 |
| Toyota FJ Cruiser | $5861 |
| Mercedes c250 | $4,030 |
| BMW z4 | $7,332 |
| **Subtotal of Equalization Payment** | $258,289 |
| GLE Payment Credit | ($12,901.70) |
| GLE | ($14,095) |
| **Total Equalization Payment** | $231,292.30 |

James concedes the checking account was improperly included. However, he correctly points out the judgment awarded him the full amount of the GLE Payment Credit, not half, as Saundra suggests. The judgment states, "[James] made post-separation payments on the 2016 Mercedes GLE, totaling $25,803.40. *This sum shall be subtracted* from the total equalization payment owed from [James] to [Saundra]." (Italics added.) While the judgment is dispositive, we also note that Saundra's closing statement

conceded that James should be credited the full GLE Payment Credit: "[Saundra] agrees that [James] paid the [Mercedes GLE] payments on her behalf [after separation], and *she agreed to be charged with that amount*." (Italics added.)

James is also correct that he only owes Saundra $185,460 for the home, not $185,500. The judgment states, "The Court finds the community interest in the [home] after [James] receives his [separate property] reimbursement claim is $370,921. The Court finds [Saundra] is entitled *to the sum of $185,460.* [James] shall pay [Saundra] *the sum of $185,460 . . .* for her interest in the [home] . . . ." (Italics added.)

The rest of the sums included in James's calculation—the rental income, daycare, Toyota FJ Cruiser, Mercedes C250, BMW Z4, and GLE—are undisputed and appear to accurately reflect the sums in the statement of decision and the judgment. When the correct amounts of the home credit ($185,460) and GLE Payment Credit ($25,803.40) are calculated together with these undisputed amounts, the total sum of the equalization payment is $218,350.60, not $231,292.[6] In other words, the family court's calculated equalization payment of $231,292 is unsupported by the record. Thus, the judgment is modified to change the amount of the equalization payment from $231,292 to $218,350.60.

---

[6] Based on Saundra's calculation, it appears the court rounded down from $231,292.30 to $231,292.

23

IV.

PHYSICAL CUSTODY

*A. Applicable Law*

James challenges the family court's decision to grant Saundra a larger share of parenting time. We review the order "for an abuse of discretion and apply the substantial evidence standard to the court's factual findings." (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497.) For the latter standard, "'the power of an appellate court *begins* and *ends* with the determination as to whether, *on the* entire *record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*'" (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143 (*Jameson*).)

"In an initial custody determination, the trial court has 'the widest discretion to choose a parenting plan that is in the best interest of the child.' [Citation.] It must look to *all the circumstances* bearing on the best interest of the minor child. [Citation.] Family Code section 3011 lists specific factors, 'among others,' that the trial court must consider in determining the 'best interest' of the child in a proceeding to determine custody and visitation: '(a) The health, safety, and welfare of the child. [¶] (b) Any history of abuse by one parent against the child or against the other parent. . . . [¶] (c) The nature and amount of contact with both parents.'" (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31–32.)

24

*B. Application of the Factors*

The family court's decision to award Saundra the majority of custodial time was based on eight factual findings.

First, living with Saundra "facilitates a consistent and convenient school commute and school routine that clearly serves the best interests of the children."

Second, "James has a limited ability to coparent, and he presents himself as the 'parent in charge.'"

Third, "Saundra demonstrated the more cooperative parent . . . ."

Fourth, "[d]uring the parties' marriage, Saundra was the primary caregiver of the minor children. She took care of them, fed them, changed them, put them to bed, handled their insurance and medical care . . . and took them to play dates."

Fifth, "[t]he children have lived in Orange County their entire lives, and their church, doctor and dentist are in Orange County."

Sixth, "[b]etween the parents, Saundra's parenting nous is superior than James to such an extent the best interest of the children are served by . . . allocating more parenting time to mother over father."

Seventh, "James is engaged in a power struggle with Saundra over dominating the role of parent and he has distorted perceptions of his parenting ability while having a blind spot to observe how his behavior causes drama, chaos, and gatekeeping."

Eighth, "[w]hile Saundra is yielding and avoids power struggles with James, in this case James does not respond in kind and in fact, is un-yielding, aggressive and demanding without good cause and he presents as being angry and less compliant with court process and orders."

25

James claims none of these findings is supported by substantial evidence. We disagree.

In making the first finding, the court noted that "Saundra lives five minutes from the children's schools and near their extracurricular activities and friends." James asserts there is no evidence in the record that Saundra lives five *minutes* from the children's schools. Rather, he argues the evidence showed she lives five *miles* from their schools. Likewise, he argues the statement of decision inaccurately stated he lives 47 miles from the children's schools. He claims the evidence indicated he only lives 28 miles from the children's schools.

Even accepting James's arguments as true, there is sufficient evidence to support the court's finding that allowing the children to live primarily with Saundra "facilitates a consistent and convenient school commute and school routine." Five miles is substantially closer than 28 miles, especially when factoring in morning and evening traffic. Thus, even using the distances argued by James, the court could still reasonably conclude that granting Saundra a larger share of parenting time would create a better commute and school routine and serve the children's best interest.[7]

The second, third, seventh, and eighth findings are related, so we address them together. Generally, James argues the record contains evidence of his ability to cooperate and coparent with Saundra. He cites several

---

[7] James seeks judicial notice of a printout of an online map showing the distance from his home to the children's school is 31.3 miles. The map is unnecessary to our analysis, so we deny the request. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [declining to take judicial notice of materials not "necessary, helpful, or relevant"].)

examples, including (1) Saundra's testimony he invited and paid for her to accompany him and the children to Disneyland in spring 2023, (2) Saundra's testimony he sometimes met her early on Thursday exchanges so she could spend more time with their younger child, and (3) his testimony that both parents should be involved in the children's lives. Likewise, he contends his proposal that the parents split equal time with the children shows a spirit of cooperation.[8]

But James misunderstands the nature of our review. We do not reweigh the evidence. We only review whether the family court's finding is supported by substantial evidence. (*Jameson*, *supra*, 107 Cal.App.4th at p. 143.) The record is replete with evidence showing James's inability to coparent or cooperate with Saundra. Much of this evidence, which James does not contest, is set forth in the statement of decision.

For example, in 2022, two days before Christmas, James agreed to allow Saundra to have the children at 10:00 a.m. on Christmas if she picked them up in Downey. A few hours later, he changed his mind and said she could not pick them up until 3:00 p.m. on Christmas. The parties continued to argue over what time Saundra would pick up the children on Christmas. On Christmas morning, Saundra told James she was on her way to pick up the children and would arrive in Downey at 10:00 a.m. He replied, "I'll put you in the dog house to play with the other bitch." Then, after she

---

[8] James also argues that his tumultuous relationship with Saundra has no effect on the love he feels for his children. While we do not doubt James's sincerity, nothing in the statement of decision or judgment questioned his bond with his children. Rather, the second, third, seventh, and eighth findings focused on his inability to coparent with Saundra, the tension between them, and the effect of this tension on the children.

arrived in Downey, James refused to exchange the children until 3:00 p.m. Similarly, a little over a week later, James agreed to allow Saundra to have the children on Orthodox Christmas but again changed his mind.

James later blocked Saundra's mobile phone number, which made communication between the parties more difficult. He was also aggressive and confrontational in text messages and e-mail exchanges. He often called Saundra vulgar names and used vile language when communicating with her, which we need not repeat here. In contrast, we have not been cited any evidence showing Saundra acted similarly towards James.[9]

As to the fourth and sixth findings, James contends the court's finding that Saundra was the primary caregiver and had superior "parenting nous" is not supported by the record. As to the fourth finding, he contends they were both primary caregivers because he worked full time and was the "financial primary caregiver." But that is not what the court meant. Rather, as the court explained in the statement of decision, Saundra primarily took care of the children's physical and emotional well-being, such as feeding them, putting them to bed, handling their medical care, and arranging play dates for them. James does not dispute any of the evidence supporting this finding. As to the sixth finding, he argues the children had more tardies at school on the days that Saundra dropped them off than on the days he dropped them off. But, based on the same evidence supporting the fourth

---

[9] James maintains the emotions from the volatile divorce caused him to act out of character, and he claims to have apologized to Saundra after trial. But the purported apology occurred after trial and was not in front of the family court. Thus, we will not consider it. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)

finding, a court could reasonably conclude Saundra had superior "parenting nous."

Finally, as to the fifth finding, James contends the children have spent time in Los Angeles County and Orange County after the parties' separation, and they are too young to have established strong roots to either location. However, there is no dispute the children had lived their entire lives in Orange County prior to the parties' separation. Nor does James contest that the children's church and medical providers are in Orange County. There is also other evidence demonstrating the children's ties to Orange County. Their schools are in Orange County, so it can be reasonably inferred that many of their friends are also in Orange County. Further, in the February 2021 stipulation, James's agreed that Orange County was the children's residence "[f]or purposes of custody and visitation . . . ."

For the reasons above, we find no error in the court's custody ruling.

## V.

### CHILD SUPPORT

Child support orders are reviewed for an abuse of discretion. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

The family court ordered James to pay Saundra $1,034 in monthly child support. In calculating this sum, it imputed a monthly income

29

of $11,298 to Saundra. James argues the court undercalculated her income, which resulted in her being awarded a higher amount of child support. We need not get into the specifics of his argument because, as set forth above, we only look to whether the court's findings are supported by substantial evidence. (*Jameson, supra*, 107 Cal.App.4th at p. 143.) Here, the judgment cites exhibit 9 for Saundra's income, which is an Income and Expense Declaration she filed in June 2023. In this declaration, Saundra states her average monthly income is $11,298, the exact amount found by the court. The court found this evidence to be credible, and we do not question this determination on appeal. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

Next, James asserts he earned $11,050 per month when trial commenced, which was comparable to Saundra's monthly earnings. He claims the court abused its discretion by ordering him to pay Saundra any child support because the parties "had equal ability to pay for and provide for their children without the aid of child support." But this argument ignores that Saundra's custodial timeshare was 70 percent compared to James's 30 percent. As such, the court could reasonably infer she would accrue more child expenses than James and award her child support.

Finally, James claims he was laid off by the time closing arguments were given and the court erred by failing to consider his unemployment when awarding Saundra child support. But there is no evidence of James's unemployment in the record. The court expressly forbade him from presenting such evidence during his closing argument because he had not moved to reopen the evidence. As explained in the statement of decision, the court "did not consider [James's] alleged loss of employment as untimely raised, and invited James to file a Request for Order after entry of

judgment." Since there was no evidence of James's unemployment, the court did not abuse its discretion by failing to consider this issue.[10]

## VI

### THE MOTION TO AUGMENT

In his reply brief in this appeal, James claims that after he filed his opening appellate brief, Saundra filed a motion to correct the judgment in the family court. He avers this motion was granted, which resulted in a corrected judgment that increased his child support obligation to $1,065 per month. James filed a motion to augment the record to include the corrected judgment. And "out of an abundance of caution," his reply brief argues the corrected judgment is void.

We deny the motion to augment, as the court's postjudgment order correcting the judgment is not within the scope of this appeal. "It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.'" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Nor has James shown that he has exhausted all means to contest the corrected judgment in the family court. He must do so before raising this issue on appeal. (See *Reserve Ins. v. Pisciotta* (1982) 30 Cal.3d 800, 813; *In re Marriage of Folb* (1975) 53 Cal.App.3d 862, 877 disapproved of on other grounds by *Fonstein v. Fonstein* (1976) 17 Cal.3d 738, 749, fn. 5.)

Moreover, James seeks to augment the record to support a new argument made in his reply brief. Generally, appellate courts do not consider

---

[10] James does not argue that the family court's failure to reopen the evidence was an abuse of discretion.

31

issues raised for the first time in a reply brief. (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275.) Allowing James to present this new argument in his reply brief would prejudice Saundra by depriving her of the opportunity to address it. (*Id.* at pp. 275–276.) While we understand the family court did not correct the judgment until after James filed his opening brief, he has not shown his options for relief in the family court have been exhausted. Similarly, James's concession that he raised this new argument "out of an abundance of caution," indicates he still has other avenues of relief. As such, we are not persuaded there is good cause to address this new argument. (*In re Marriage of Ackerman, supra,* 146 Cal.App.4th at p. 214.) Because we do not address this new argument, there is no need to augment the record.

DISPOSITION

The judgment is modified to change the equalization payment from $231,292 to $218,350.60, and in all other respects it is affirmed. Each party shall bear their own costs on this appeal.


MOORE, ACTING P. J.

WE CONCUR:


MOTOIKE, J.


SCOTT, J.

32